David L. HEILMAN, and E–C Tape Service, Inc., a Wisconsin Corporation, Plaintiffs-Appellants,

v.

Griffin B. BELL, Attorney General of the United States of America, his agents, servants, employees, attorneys, successors and all those persons in active concert of participation with them, Defendants-Appellees.

No. 77–1968.

United States Court of Appeals, Seventh Circuit.

Argued Feb. 21, 1978.

Decided Sept. 6, 1978.

Rehearing and Rehearing In Banc Denied Oct. 5, 1978.

Swygert, Circuit Judge, dissented and filed statement.

Bruce F. Ehlke, Madison, Wis., for plaintiffs-appellants.

William E. Callahan, Jr., Asst. U. S. Atty., Milwaukee, Wis., for defendants-appellees.

Before FAIRCHILD, Chief Judge, CASTLE, Senior Circuit Judge, and SWYGERT, Circuit Judge.

CASTLE, Senior Circuit Judge.

This appeal presents to this court for the first time an issue which has already been decided by four other circuits: whether the compulsory license provision of the Copyright Act of 1909 can be used to prevent tape duplication of musical recordings. The district court followed the result reached by all of the other circuit courts and by several federal district courts in holding that tape duplicators cannot avoid copyright infringement under the compulsory license provision of the 1909 Act. We affirm.

I.

The facts of this case are not in dispute. Plaintiff David L. Heilman was president of E–C Tape Service, Inc. which sold tape and record "anthologies" consisting of popular music selections originally recorded prior to February 15, 1972. E–C Tape would obtain the original recordings of the desired musical selections, duplicate them onto blank records and tapes, and then sell the duplications as part of a "new" package at prices approximately equal to that of the original recordings.

In 1975 the United States Attorney General announced that he intended to prospectively prosecute such duplicators, or "tape pirates," for willful infringement of the federal copyright laws. 17 U.S.C. §§ 1(e), 101(e), and 104.[1] After receiving this no-

---

1. A complete revision of the federal copyright laws was enacted October 19, 1976 to become effective January 1, 1978. All citations in this opinion refer to the law prior to January 1, 1978.

tice, plaintiffs brought this suit seeking a declaratory judgment that these duplications did not violate the copyright laws and an injunction prohibiting any future prosecution. In support of their request, plaintiffs noted that under the 1909 Act, it is settled that only the musical composition, and not the recording thereof, is subject to copyright protection. Further, once the composer authorized the mechanical recording of his composition, the so-called "compulsory license" provision of § 1(e) allowed anyone else to make "similar use" of the copyrighted composition upon giving appropriate notice and paying a royalty of two cents to the composer for each copy of the new recording produced. Although Congress amended the copyright laws in 1971 to provide protection for the recording itself, in this case the plaintiffs were careful to duplicate only those selections originally recorded before the February 15, 1972 effective date of that amendment. Consequently, plaintiffs contend that since they gave notice and tendered the royalty payments, they did not infringe upon the composition copyright.

The district court for the Eastern District of Wisconsin denied plaintiffs' request for a temporary restraining order, preliminary injunction and the convening of a three-judge court. 391 F.Supp. 1106. Subsequently, criminal proceedings were filed against plaintiffs in the Northern District of Illinois. On July 14, 1977, the Eastern District of Wisconsin district court granted the government's motion for summary judgment. 434 F.Supp. 564. This appeal followed.

## II.

Plaintiffs' main contention is that they have satisfied the compulsory license requirements of § 1(e) and therefore cannot be prosecuted for copyright infringement. As noted above, four circuit courts have addressed the precise issue of whether tape duplicators can avoid copyright infringement by giving notice and paying the two-cent royalty. *Fame Publishing Co., Inc. v. Alabama Custom Tape, Inc.,* 507 F.2d 667 (5th Cir.), *cert. denied,* 423 U.S. 841, 96 S.Ct. 73, 46 L.Ed.2d 61 (1975); *Jondora Music Publishing Co., Inc. v. Melody Recordings, Inc.,* 506 F.2d 392 (3d Cir. 1974), *cert. denied,* 421 U.S. 1012, 95 S.Ct. 2417, 44 L.Ed.2d 680 (1975); *Edward B. Marks Music Corp. v. Colorado Magnetics, Inc.,* 497 F.2d 285 (10th Cir. 1974) (*en banc*), *cert. denied,* 419 U.S. 1120, 95 S.Ct. 801, 42 L.Ed.2d 819 (1975); *Duchess Music Corp. v. Stern,* 458 F.2d 1305 (9th Cir.), *cert. denied,* 409 U.S. 847, 93 S.Ct. 52, 34 L.Ed.2d 88 (1972). In each case, the court held that the compulsory license provision of § 1(e) was not available to tape duplicators. We adhere to the reasoning of those courts.

As noted above, under the compulsory license provision of the 1909 Act, once the composer authorizes the first recording of the copyrighted composition, anyone who satisfies the notice and royalty requirements can make similar use of the composition. The crucial question in this case is whether duplication is a "similar use." The reasoning of the duplicators, as expressed by Professor Nimmer, is that

the only portion of that which has been duplicated which is protectible under the Copyright Act is the musical composition itself, which is authorized for use for recording purposes upon payment of the statutory royalties.

Nimmer on Copyright, § 108.4621 at 431 (1976). The problem with this view is that it overgeneralizes the scope of the compulsory license entitlement by interpreting "similar use" as the equivalent of all "recording purposes." However, careful emphasis must be placed upon the words "similar use" in order to adequately protect the composer-copyright holder's protected interest. The statutory scheme gives the composer the first opportunity to benefit from his original composition. This includes the right to gain from the initial recording contract, the terms of which will be dependent upon the recorder's costs in making the recording (for example the cost of hiring musicians and artists, and using recording equipment) and upon the profits from selling copies of the recording.

■ Once the copyright holder has benefited by making a recording of the composition, he must permit others who pay the statutory royalty to similarly use the composition, i. e., to "make a recording." However, duplicating a recording is not similar to making a recording of the composition. The duplicator does not take the composition as "raw material" and go through the creative and financial steps of producing a recording. *Edward B. Marks Music Corp. v. Colorado Magnetics, Inc.,* supra at 288. The only similarity is in the end product which is based upon the composition. There is no similarity in the "use" of the composition.[2] Also, while the difference between making a recording and duplicating a recording (making a recording of a recording) may seem negligible semantically, the impact of the latter upon the copyright interest of the composer is clear. The copyright holder's benefit is substantially reduced by the inevitable lower profits which result from duplicators who can re-record for a fraction of the original cost and thus undersell the authorized recorder. Plaintiffs' argument that the composer-copyright holder's interest is protected by the two-cent royalty payment is unconvincing. Accepting that position would distort the statutory scheme since it would force the composer to forego the full benefit of the presumably more lucrative arrangement with the first recorder. Thus, we find that the plaintiffs' duplication of the original recordings is not a "similar use" within the meaning of § 1(e).[3]

■ Although plaintiffs and the dissenting opinions in the four prior circuit court cases dispute this interpretation of "similar use," we find their arguments unpersuasive. First, our interpretation effectuates the dual purposes of the compulsory license provision: to encourage creativity by ensuring first recording benefits would accrue to the composers and to avoid a monopoly whereby copyright holders could exclusively and indefinitely control who would record their copyrighted compositions. *Fame Publishing Co., Inc. v. Alabama Custom Tape, Inc.,* supra at 670. Our holding continues to avoid complete composer control over who may record since anyone who satisfies the notice and royalty provisions is free to hire musicians, artists, and equipment and make a recording of a previously recorded composition. However, our holding also protects the composer-copyrightholder who can realize the full benefit of his arrangement with the recorder of the original version.

■ Second, we recognize that certain congressional reports on the 1971 amendments to the Copyright Act indicate that some members believed there was no action for copyright infringement available against duplicators prior to the creation of a copyright interest in the recording itself. S.Rep.No.92–72, 92d Cong., 1st Sess. (1971); H.R.Rep.No.92–487, 92d Cong., 1st Sess. (1971); 1971 U.S.Code Cong. & Admin. News, p. 1567.[4] However, we are not

**2.** Judge Weis of the Third Circuit gave an accurate example of this distinction:

> To put the concept in a different setting—the court reporter, who listens to the sound of a witness's voice, makes notes on a stenotype machine and then types the words on sheets of paper, makes use of the witness's oral statements. A person who simply photocopies the transcript does not make the same or a similar use of the witness's voice sounds.

*Jondora Music Publishing Co., Inc., v. Melody Recordings, Inc.,* supra at 395 n.10.

**3.** We take note of the statement of plaintiff Heilman that composers often sell their compositions to publishing companies who are in turn owned by recording companies. (Heilman Affid. ¶ 14). Thus, a recorder is also the copyright holder in many instances. We do not see

why the recorder as successor in interest should enjoy any less rights under a valid copyright than the composer. However, even if the copyright protection of the composition did diminish after assignment, the interest of the composer secured by the copyright law would still be harmed should the authorized recording be duplicated. This follows since the composer would not be able to demand as high a price for selling the composition for recording if the recorder's profits could be diminished by duplication. Therefore, we do not distinguish between the copyright holder as composer or recorder.

**4.** Subsequently, according to reports published during consideration of the 1976 amendments to the federal copyright laws, congressional interpretation of the 1909 Act shifted:

> The basic intent of this sentence is to make clear that a person is not entitled to a com-

bound by congressional interpretation of a prior existing law. *United States v. Southwestern Cable Co.,* 392 U.S. 157, 170, 88 S.Ct. 1994, 20 L.Ed.2d 1001 (1968). This is particularly true given the substantial length of time between the congressional session which produced the 1909 Act and that which produced the amendments of 1971. *Edward B. Marks Music Corp. v. Colorado Magnetics, Inc., supra* at 289. Moreover, Congress must necessarily deal with broad policy questions and, consequently, was free to determine that additional protection was needed to protect the recordings themselves. The fact that the 1971 amendments afforded such protection, however, does not interfere with our holding on the narrow issue as to what constitutes "similar use" with respect to protection of the composition.

Third, our holding is supported by the overwhelming weight of judicial authority. In addition to the four circuit court cases noted above, several federal district courts have also concluded that the compulsory license provision of § 1(e) is not available to tape duplicators. *E–C Tapes, Inc. v. Kelly,* 412 F.Supp. 245, 248 (N.D.Ill.1975); *International Tape Distributors, Ltd. v. Levi,* 188 U.S.P.Q. 539 (D.D.C.1975). *See also Stereo Tape Associates Inc. v. Levi,* (W.D.Mich. May 14, 1976, Civ. No. 75–167); *Stereo Tape Associates, Inc. v. Levi,* (E.D.Mich. November 7, 1975, Civ. No. 5–70687); *United States v. Bodin,* 375 F.Supp. 1265, 1269 (W.D.Okl.1974); *Aeolian Co. v. Royal Music Roll Co.,* 196 F. 926, 927 (W.D.N.Y.1912). Plaintiffs' citation of *Goldstein v. California,* 412 U.S. 546, 93 S.Ct. 2303, 37 L.Ed.2d 163 (1973), is misplaced. In that case, the Supreme Court was concerned with whether the supremacy clause barred states from protecting the recording itself from tape duplicators. In contrast, here we are dealing with the copyright interest of the composer-copyrightholder and not the interest

of the recorder alone. Consequently, we agree with earlier courts that *Goldstein* is distinguishable. *Jondora Music Publishing Co., v. Melody Recordings, Inc., supra* at 396 & n.12.

■ We also find no merit in plaintiffs' argument that they were making a new product by arranging the duplications in an anthology format. According to this argument, plaintiffs would also be free to make a copy of a copyrighted nonrecorded composition, which would not be subject to the § 1(e) proviso, and publish it in a book of sheet music with other compositions provided they could point to a central organizing theme. Such a result is obviously improper under the copyright laws. Nor do we accept plaintiffs' policy argument that they assist the public in obtaining older selections which were unavailable or unavailable in a certain medium. If a market exists for these selections, plaintiffs should be able to negotiate with the copyright holder to duplicate the recordings at a fair price. Therefore, we find that the compulsory license provision of the 1909 Act does not protect the plaintiff duplicators from infringing the copyright in the composition.

### III.

■ In the course of finding the compulsory license provision of § 1(e) to be unavailable to plaintiffs, we have substantially answered the second issue in this case: criminal charges under 17 U.S.C. §§ 101(e) and 104 may be brought against tape duplicators who have attempted to comply with § 1(e). This follows since § 101(e) clearly states that "interchangeable parts" such as tapes and record discs are to be considered copies of the copyrighted composition for purposes of copyright infringement. § 101(e) further provides that the "unauthorized manufacture, use, or sale of such interchangeable parts shall constitute an in-

---

pulsory license of copyrighted musical works for the purpose of making an unauthorized duplication of a musical sound recording originally developed and produced by another. It is the view of the Committee that such was the original intent of the Congress in

enacting the 1909 Copyright Act, and it has been so construed by the 3rd, 5th, 9th, and 10th Circuits . . .

H.R.Rep.No.94–1476, 94th Cong., 2d Sess. 108; 1976 U.S.Code & Admin.News, p. 5723.

fringement of the copyrighted work." Since there was no express authorization and the § 1(e) compulsory license is unavailable, plaintiffs were "unauthorized" and, consequently, subject to all remedies relating to infringement including criminal penalties under § 104.

Plaintiffs' main argument on this issue is that this conclusion is improper given the changing state of the copyright laws in recent years. Plaintiffs contend that the criminal penalties for infringement of musical composition copyrights were added to § 101(e) with the amendments of 1971 which, as noted above, was a time when Congress felt duplicators could not be infringers if they complied with § 1(e). Accordingly, plaintiffs reason, Congress only intended for the criminal sanctions to reach those who failed to pay the statutory royalties.

■ This argument was dealt with in depth by the district court in its denial of plaintiffs' motion for a preliminary injunction. Chief Judge Reynolds reasoned that legislative history normally is consulted only when the statute is unclear and, as noted above, such is not the case with § 101(e). 391 F.Supp. at 1112. *See Stern v. United States Gypsum, Inc.,* 547 F.2d 1329, 1335 (7th Cir.), *cert. denied,* 434 U.S. 975, 98 S.Ct. 533, 54 L.Ed.2d 467 (1977). Also, the district court noted that by amending § 101(e), Congress was merely expanding remedies for infringement and was not concerned in this section with what constituted infringement. 391 F.Supp. at 1113. We find this reasoning persuasive. We also find guidance in § 3 of the Sound Recording Act of 1971. That section made the 1971 amendment to § 101(e) effective immediately upon enactment while expressly barring retroactive application only to the amended § 1(f) which gave copyright protection to recordings. Thus, while pre-February 15, 1972 recorders could not claim a copyright interest in their recordings, there is nothing in the statute which prohibits the criminal

penalties of §§ 101(e) and 104 from being applied to tape duplicators who have infringed upon the composer's copyright.[5]

For the reasons stated above, the judgment of the district court is affirmed.

AFFIRMED.

SWYGERT, Circuit Judge, dissenting.

I respectfully dissent. I am essentially in agreement with the views expressed by Judge Gibbons, dissenting in *Jondora Music Publishing Co. v. Melody Recordings, Inc.,* 506 F.2d 392 (3d Cir. 1974), as well as with Judge Godbold's views, dissenting in *Fame Publishing Co. v. Alabama Custom Tape, Inc.,* 507 F.2d 667 (5th Cir. 1975).

---

5. Of course, §§ 101(e) and 104 require proof that the infringement was willful and for profit. We express no opinion on the ability of the government to prove its case in any criminal prosecution.